The opinion of the Court was delivered by
Colcook, J.
A prohibition may issue upon a suggestion, that either the cause originally, or some collateral malice arising therein, does not belong to that jurisdiction,[1] but to the recognizance of some other count. 3 Black. Com. p. 112.
The inquiry then will be, whether this Court, which has tried the slave, had original jurisdiction of the case, and whether on any collateral matter arising on the trial of the case, they exceeded their jurisdiction, or violated any of the laws of the land ? The Act of 17 40,[2] P. L. 52, 1 Brev. Dig. p. 463, enacted that all crimes and offences which shall be committed by slaves, in the (then) province, and for which capital punishment shall or lawfully may be inflicted, shall be heard, examined, tried, and -I *adjudged, and finally determined by any two justices assigned to keep the peace, and any number of freeholders not less than three, or more than five, in the county where the offence shall be committed, and can be most conveniently assembled.
Upon an examination of the proceedings in this case, it is apparent that the provisions of this Act have been complied with, and there can be no doubt that it gives to those who tried the case, cognizance of the offence. Upon a just construction of the clause, I think it sufficient, that the magistrates and freeholders should be of the county. But if any objection could legally have been made to the jury, they should have been challenged at and before the trial.[3] This is a sufficient disposition of the fifth, and what appeared to be the most material ground. But as it is a matter of great public concern, I will proceed to examine the other grounds. As to the first, the Act of 1740, sec. 16, expressly declares, that “ if any slave shall feloniously steal, take, or carry away, any slave, being the property of another, with intent to carry such slave out of this *477 Province, he shall suffer death as a felon.” This is one of the charges in the indictment. And as to the objection stated in the first ground, that force is necessary to constitute the offence, I think it wholly untenable; If there had never been any other law on the subject, I should have said, that to entice[1] a slave to leave his master, was a taking and carrying away within the meaning of this Act. With inanimate subjects of larceny, force may be necessary, and must be used ; but is there anything in reason or common sense which requires it as to those subjects of larceny which possess volition and locomotion ? Is not the idea, as to both, the deprivation which the owner of the property sustains? Suppose a horse or a hog to be tolled out of the possession of the owner by corn, is not this as much a taking and carrying away as the shouldering of a bale of goods would be ? I confess I can see no substantial legal difference.
*The second ground applies to the second count in the indictment. The Act of 1140, sec. 17, declares it felony and death to ■- those slaves who shall endeavor to delude or entice any slave to run away and leave this Province. But the 14th see. of the Act of 1751,[2] declares this punishment too great for the nature of the offence, as such offender might afterwards change his intentions, and enacts that the law shall not operate or take effect unless it appear that such slave, so endeavoring to elude or entice other slaves to run away and leave this Province, shall have actually prepared provisions, arms, ammunition, horse or horses, &c. Whether the evidence was sufficient to support this charge, is a question of fact, and might be made the ground of an appeal which is not for the determination of this Court.
It may not be amiss, however, to observe, without determining on the weight of evidence, that there was testimony that he meant to carry the negro ont of the State; that is, he said, to a free country, which, as to her, must necessarily have been some other than this. And also that there was evidence that he did procure a horse, or what might have raised a presumption that he did, that he promised to carry off the clothes; that the clothes were carried as well as the slave, with a celerity and success which would seem to imply the use of a horse.
As to the fourth ground, it is enacted by the Act of 1754,[3] “That from and immediately after the 24th of June, then next ensuing, all and every person or persons who shall inveigle, steal, or carry away, any negro, or slave, or slaves, or shall hire, aid, or counsel, any person or persons to inveigle, steal, or carry away, as aforesaid, any such slave, so that the owner or employer of such slave, or slaves, shall be deprived of the use or benefit of said slave or slaves ; or that shall aid any slave or slaves in running away or departing from his master’s or employer’s service, shall be, and he, and they, is, and are hereby declared to be guilty of felony, and shall suffer death without benefit of clergy *which Act, when taken in connection with the other Acts, seems to complete the system, and from the generality of the terms must be considered as comprehending negroes as well as others. The policy of the country, as well as the express law, 1740, sec. 15,[4] makes it necessary that those offences which are declared to be felonious when commit-[*179 *478 ted by white men, should be also felonious when committed by negroes. The former Acts, which relate to negroes, only made it felony to steal or entice a negro so as to carry him out of the State. This Act makes it so to steal or inveigle them, or aid others in doing so, although they be not carried out of the State, If it were not for this Act, and its application to negroes, how easy would it be for evil disposed persons to make their slaves the agents of their villainy. Although slaves are held to be the absolute property of their owners, yet they have the power of committing crimes ; and although in regard to this crime, they have not such inducements as whites, yet they may make it a business of gain, and may even by such acts obtain their own freedom. It has been adjudged, that a negro shall be considered so far amenable to the common law as to-make one of three to constitute the number necessary to make a riot. The State v. Thackam and Mayson, (1 Bay, 358.)[1] If any further observation were necessary to show the necessity and propriety of comprehending negroes in the general words, “ person or persons,” used in this Act, I would remark, that the very next clause in this Act extends the times within which negroes shall be tried for capital offences. Prom which I would infer, that the Legislature had them in view at the time the Act was passed ; and I think the association of the subjects well warrants the conclusion. Having noticed the different grounds stated, I add, that prohibition will not lie after sentence, unless the want of jurisdiction appear on the face of the proceedings. Cowper, 422. 4 T. R. 382. Douglas, 380. In the last case some objection was made as to a matter of fact. Lord Mansfield ^observed, “ the objection being on a matter of fact, which did not appear on the proceedings, the prohibition could not be granted.” *180]
Rodgers, for the motion. Williams, contra.
I am against the motion.
RichaRDSOn, J., concurred.
Nott, J.:
If the Act of 1154 stood alone, I do not know that I should consider it as extending to negro slaves, but taking all the Acts together, I think they embrace this case, and therefore the motion ought to be refused.
Johnson, J., concurred with Nott, J.
Gantt, J., dissented.
1 N. & McC. 503 ; Post. 410, 419.

 Post. 410, 419 ; 1 N. & McC. 504.

 7 Stat. 400, l 9. See Act of 1839, 11 Stat. 22, § 28.

 Ante, 192; Post. 264.

 Ante, 4.

 Stat. 423.

 7 Stat. 426.

 See Act of 1831, 7 Stat. 468, § 4; 2 Strob. 42.